**Andre D. MITCHELL, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 07–CO–1398.**

District of Columbia Court of Appeals.

Argued Dec. 16, 2008.

Decided Aug. 13, 2009.

Bernadette Sargeant, Washington, appointed by the court, for appellant.

Erin Walsh, Assistant United States Attorney with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Mary B. McCord, Margaret J. Chriss, and Cormac T. Connor, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, GLICKMAN, and THOMPSON, Associate Judges.

REID, Associate Judge:

Appellant, Andre D. Mitchell, was convicted after a bench trial on two counts of misdemeanor sexual abuse and one count of lewd, indecent or obscene acts.[1] The trial court sentenced him to 180 days of confinement, certified Mr. Mitchell as a Class B Sexual Offender pursuant to the Sex Offender Registration Act of 1999 ("SORA"),[2] and assessed costs in the aggregate amount of $150 pursuant to the Victims of Violent Crime Compensation Act of 1981. This Court affirmed Mr. Mitchell's convictions in a memorandum opinion and judgment.[3] After serving his

---

1. D.C.Code § 22–3006 and § 22–1312(b). The trial court dismissed an assault count.

2. The classification was mandatory under the SORA given the nature of the offenses.

3. *Mitchell v. United States*, No. 06–CF–18, 928 A.2d 730 (D.C. July 18, 2007).

prison sentence on the charges in this case,[4] Mr. Mitchell moved for a new trial pursuant to D.C.Code § 23–110 and requested a hearing, alleging ineffective assistance of counsel. The trial court denied his motion without a hearing, and concluded that the requirement that Mr. Mitchell register under the SORA within three days of his release from prison did not place him "in custody" for purposes of § 23–110. On appeal from that ruling, Mr. Mitchell contends that he is still "in custody" because he has not yet registered under SORA or paid his $150 fine, and therefore the court has jurisdiction to grant him a new trial under § 23–110. We disagree and affirm the judgment of the trial court for the reasons below.

## FACTUAL SUMMARY

The record shows that in December 2004, Mr. Mitchell was living with his girlfriend, R.P. in her two-bedroom apartment with her four children, including the victim in this case, nine-year-old A.P. A.P.'s grandfather also stayed in the apartment from time to time.

Sometime in late December or early January 2005,[5] A.P. was watching television in her bedroom when Mr. Mitchell entered the room and proceeded to engage in sexual contact with her. On another occasion some days later, while A.P.'s mother, R.P., was out of the apartment, A.P. was lying down in her mother's bedroom watching television when Mr. Mitchell entered the room and again initiated and engaged in sexual contact with her.

Several weeks passed before A.P. told anyone what had happened. In the days and weeks that followed these incidents,

A.P. began to have trouble at school, although normally she was a good student and well-behaved. Her teacher called R.P. several times to report that A.P. had become disruptive and was not paying attention in class. A.P. also began wetting her bed at night.

A.P. had been sexually assaulted by her cousin,[6] and R.P. remembered that afterward, A.P. had been quiet and refused to talk to her. When she learned that A.P. had wet her bed, R.P. grew very concerned and called her into the bathroom to ask her what was going on. R.P. asked A.P. if anyone had been touching her, and A.P. responded by lowering her head and saying she didn't know. R.P. told her to pick up her head and asked if A.P.'s grandfather or brother had touched her. A.P. said they had not. R.P. then asked if Mr. Mitchell had been touching her, and A.P. again lowered her head and said nothing. At her mother's insistence, A.P. told her what happened.

R.P. then indirectly confronted Mr. Mitchell, saying someone had done something to hurt A.P. Mr. Mitchell responded by avoiding eye contact and remaining quiet. R.P. then ordered Mr. Mitchell out of the apartment, but about an hour later found him back in the apartment, alone behind a closed door with A.P. Enraged by Mr. Mitchell's behavior, R.P. instructed her older daughter to call 911. Upon their arrival, the police arrested Mr. Mitchell.

The government presented the testimony of A.P., R.P., and A.P.'s grandfather. Mr. Mitchell, the sole witness for the defense, denied having sexual contact with A.P., and, on cross-examination, claimed

---

**4.** Mr. Mitchell's parole on an earlier unrelated conviction was revoked and he is still incarcerated in a federal prison.

**5.** A.P. could not recall the exact dates of the incidents, and because she did not tell an

adult until well after the incidents had passed, the exact dates are unclear.

**6.** Mr. Mitchell and R.P. had been attending counseling sessions with A.P. to overcome the trauma of that incident.

that A.P. had walked into the bathroom twice while he was naked.

After finding Mr. Mitchell guilty of three of the four counts with which he was charged, the trial court imposed a prison term of 180 days, and certified him as a Class B Sexual Offender on December 9, 2005. On May 8, 2007, months after the completion of his prison term imposed in this case, Mr. Mitchell filed a motion for a new trial under D.C.Code § 23–110. The government filed an opposition to which Mr. Mitchell replied. On September 17, 2007, the trial court ordered the parties to address the question "whether defendant is 'in custody' for purposes of filing a § 23–110 motion."

Mr. Mitchell's response to the trial court's order focused only on the SORA registration requirement, and did not mention the assessment under the Victims of Violent Crime Compensation Act. The government's reply argument examined only the SORA registration requirements, as did the trial court's order. Not until his reply brief in this Court did Mr. Mitchell broach the Victims of Violent Crime Compensation Act in his discussion of the "in custody" requirement under D.C.Code § 23–110.

## ANALYSIS

D.C.Code § 23–110 provides in pertinent part that a prisoner "in custody under sentence of the Superior Court claiming the right to be released upon ground that ... the sentence is ... subject to collateral attack [ ] may move the court to vacate, set aside, or correct the sentence." [7] Mr. Mitchell argues that he is still eligible to seek relief under § 23–110 because he has not completed the sentence on the convictions underlying this appeal and is therefore still "in custody." He contends that the trial court erred in refusing to hear his

ineffective assistance of counsel claim for lack of jurisdiction. He concedes that he has served the duration of his prison sentence, but because his parole was revoked on an unrelated matter, he is still incarcerated, and has not yet registered as a sex offender or paid the $150 fine. Mr. Mitchell contends that SORA registration is as much a part of his sentence as his jail term, and that until he registers upon release from prison, he is still "under sentence" and therefore "in custody." He does not challenge the legality of SORA or the requirement that he register once released if he is denied relief from the underlying convictions.

Mr. Mitchell also asserts that his trial counsel rendered ineffective assistance under the Sixth Amendment because he failed to cross-examine A.P. regarding inconsistencies between her trial testimony and statements she made in a pretrial interview conducted by the government. Given that the trial became a battle of credibility, and that the defense theory was that A.P. fabricated the incidents to avoid punishment from her mother, Mr. Mitchell argues that his counsel's failure to impeach the government's central witness on every potential ground was deficient and prejudiced Mr. Mitchell's defense. Furthermore, he contends that the trial judge was overly deferential to defense counsel's performance at trial.

The government responds that compulsory sex offender registration requirements are collateral consequences of sex offense convictions and, therefore, do not place putative registrants "in custody" for jurisdictional purposes. The government also points out that because SORA requirements are regulatory rather than punitive, their application to an offender does not constitute "custody" for purposes of relief under § 23–110. Moreover, the gov-

7. D.C.Code § 23–110(a) (2001).

ernment maintains that because SORA registration is triggered automatically by conviction of a registration offense, SORA registration is not actually a part of Mr. Mitchell's sentence. As to the argument that an unpaid fine renders Mr. Mitchell "in custody," the government counters that a fine simply does not constitute a restraint on liberty.

In response to Mr. Mitchell's ineffective assistance of counsel claim, the government argues that he has not demonstrated deficient representation by his lawyer, who worked diligently to develop the defense theory of fabrication in his opening and closing statements, made appropriate objections, and effectively cross-examined A.P. regarding her bias and motivation to fabricate her accusations. The government notes that the trier of fact, the trial judge, determined that A.P.'s detailed, straightforward testimony was credible while the judge did not believe Mr. Mitchell's brief testimony and blanket denials, thus obviating the need for a hearing on the § 23–110 motion.

■ We review *de novo* the trial court's legal conclusions and any issues of statutory construction.[8] When interpreting the "in custody" requirement of D.C.Code § 23–110, this court may rely on federal cases construing 28 U.S.C.

§ 2255(a) since § 23–110(a) is patterned after and is virtually identical to 28 U.S.C. § 2255(a).[9]

■ "History, usage, and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient ... to support the issuance of habeas corpus."[10] The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty.[11] Collateral consequences of a conviction, such as the ability to vote, engage in certain businesses, hold public office, or serve as a juror, are insufficient to satisfy the "in custody" requirement for habeas jurisdiction.[12] Once the sentence imposed by the Superior Court has expired, the collateral consequences of the underlying conviction are not themselves sufficient to render an individual "in custody" for purposes of a § 23–110 motion.[13]

In *Jones,* the Supreme Court considered whether the conditions applicable to a parolee rendered him "in custody" for purposes of federal habeas corpus jurisdiction, and established principles that will guide our determination of whether Mr. Mitchell is "in custody" by virtue of having to register as a sex offender.[14] The Court looked to the specifics of Jones' parole, noting in

8. See *McNeely v. United States,* 874 A.2d 371, 387 (D.C.2005); *Feaster v. Vance,* 832 A.2d 1277, 1281–82 (D.C.2003) (noting that jurisdictional challenges raise issues of statutory construction, and hence the trial court's rulings are subject to *de novo* review in this court); *see also In re Doe,* 855 A.2d 1100, 1102 (D.C.2004) (question whether a federal offense requires registration under SORA is a matter "of statutory interpretation and hence our review is *de novo* ").

9. *Snell v. United States,* 754 A.2d 289, 291 n. 3 (D.C.2000) ("federal cases arising under [28 U.S.C.] section ... 2255 guide us in considering the requirement of 'custody' as a basis for executing authority under section 23–110") (citation omitted).

10. *Jones v. Cunningham,* 371 U.S. 236, 240, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

11. *Hensley v. Municipal Court,* 411 U.S. 345, 351, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973).

12. *Maleng v. Cook,* 490 U.S. 488, 491–92, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989) (per curiam).

13. See *id.* at 492, 109 S.Ct. 1923; *see also Jeffrey v. United States,* 892 A.2d 1122, 1126 (D.C.2006) (citing *Thomas v. United States,* 766 A.2d 50, 51 (D.C.2001)).

14. See *Jones, supra* note 10, 371 U.S. at 236, 242–43, 83 S.Ct. 373; *see also In re W.M.,* 851 A.2d 431 (D.C.2004), *cert. denied,* 543 U.S. 1062, 125 S.Ct. 885, 160 L.Ed.2d 792 (2005).

particular that, although the petitioner was not incarcerated,

> Petitioner is confined by the parole order to a particular community, house, and job at the sufferance of his parole officer. He cannot drive a car without permission. He must periodically report to his parole officer, permit the officer to visit his home and job at any time, and follow the officer's advice. He is admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live a clean, honest, and temperate life ... [H]e must live in constant fear that a single deviation, however slight, might be enough to result in his being returned to prison ... [H]e might be thrown back in jail ... with few, if any, of the procedural safeguards that normally must be and are provided to those charged with crime.[15]

Acknowledging that such restrictions may be desirable parts of the rehabilitative process, the Court emphasized that what matters in the custody determination is whether the legal disability "significantly restrain[s] petitioner's liberty to do those things which in this country free men are entitled to do."[16]

We have yet to confront the particular question presented in the case at bar, but those jurisdictions that have addressed whether sex offender registration requirements render prospective registrants "in custody" have all concluded that the custody requirement turns largely on the notion of a physical sense of liberty—that is, whether the legal disability in question somehow limits one's freedom of movement.[17] Those courts have held that the classification, registration, and notification requirements are more properly characterized as a collateral consequence of conviction rather than as a physical restraint on liberty.[18] As such, they have concluded that imposition of sex offender registration does not render habeas petitioners "in custody."

■ Thus, the threshold question to be decided in this case is whether the conditions imposed by SORA registration constitute a restraint on Mr. Mitchell's liberty, or are more properly characterized as a collateral consequence of sex offense convictions. Mr. Mitchell attempts to recast these cases, arguing that they "turned on the habeas petitioner's challenge to the legality of the challenged sex offender registration statute at issue and to the imposed obligation to register." (Appellant's Brief at 23). We disagree with Mr. Mitchell's reading of these cases.[19] What the Sixth and Seventh Circuit cases on point hold is that in order for an habeas petitioner to satisfy the "in custody" language of the federal habeas statute, as mirrored in the language of § 23–110, he or she must demonstrate that his or her freedom of physical movement is restricted by the

---

**15.** *Jones, supra* note 10, 371 U.S. at 242, 83 S.Ct. 373.

**16.** *Id.* at 243, 83 S.Ct. 373.

**17.** *See Leslie v. Randle,* 296 F.3d 518, 522 (6th Cir.2002); *see also Virsnieks v. Smith,* 521 F.3d 707, 718–19 (7th Cir.2008) ("[C]ourts have rejected uniformly the argument that a challenge to a sentence of registration under a sexual offender statute is cognizable in habeas.") (citations omitted).

**18.** *See Leslie, supra* note 17, 296 F.3d at 522 (citing *Williamson v. Gregoire, supra* note 17, 151 F.3d 1180, 1183)(1998)).

**19.** *See, e.g., Leslie, supra* note 17, 296 F.3d at 523 ("[T]he Ohio Supreme Court's conclusion that the sexual-predator statute is a form of civil regulation provides additional support for our conclusion that the classification, registration, and community notification provisions are more analogous to collateral consequences such as the loss of the right to vote than to severe restraints on freedom of movement such as parole.").

state-imposed legal disability. Whether the petitioners in each case were challenging the legality of the sex offender statutes or not, the courts in each case conducted the same "in custody" analysis and all reached the same conclusion: an obligation to register as a sex offender does not constitute a physical restraint on liberty sufficient to render the prospective registrant "in custody."

In addition to the federal authorities cited above, "[w]e have fully analyzed SORA in ___ In re W.M., 851 A.2d 431, 440–51 (D.C.2004)," and, among other things, we concluded that "SORA is a remedial regulatory requirement, not a penal law."[20] We reached this conclusion by applying the Supreme Court's reasoning in Smith v. Doe,[21] in which the Court rejected constitutional challenges to Alaska's sex offender registration statute. We first determined that the legislature fully and explicitly intended to create a civil, regulatory regime, the features of which "do not constitute criminal punishment."[22] We then examined whether the statutory scheme is "so punitive either in purpose or effect" so as to override the legislature's clear intent, and determined that it was not.[23] Nor did we agree with W.M. that "procedural integration of SORA with the sentencing of sex offenders in Superior Court" was sufficient to negate the legislature's intent to regulate sex offenders upon their release into society in the interest of public safety.[24] We explained that "[b]y virtue of their convictions in Superior Court, sex offenders become subject to SORA's requirements, so it makes sense to coordinate the implementation of SORA with the criminal process."[25] Since SORA is not a punitive statute, we must examine how it is applied to registrants to determine whether the obligation to register renders an offender "in custody" for purposes of § 23–110.

The practical implications of compliance with the District of Columbia's SORA are central to determining whether a prospective registrant is restrained in his freedom of movement—if so, he is "in custody" within the meaning of § 23–110, and the Superior Court has jurisdiction to review his conviction on the merits. SORA requires those who have committed serious sex offenses to register in person with the Court Services and Offender Supervision Agency ("CSOSA") if they live, work, or attend school in the District of Columbia.[26] In Mr. Mitchell's case, he is required to register within three days of his release from prison. All registrants must provide CSOSA with a photograph, fingerprints, and other identifying information.[27] They

20. *In re W.M., supra* note 14, 851 A.2d at 441 (D.C.2004) ("[R]egistration and notification are regulatory measures adopted for public safety purposes, and do not constitute criminal punishment.").

21. 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003).

22. *In re W.M., supra* note 14, 851 A.2d at 441 (D.C.2004) ("The Judiciary Committee Report ... state[s] explicitly that 'registration and notification are regulatory measures adopted for public safety purposes, and do not constitute criminal punishment.)' ''

23. *Id.* at 442 (citing *Smith, supra* note 21, 538 U.S. at 92, 123 S.Ct. 1140).

24. *Id.*

25. *Id.* at 443.

26. *In re W.M., supra* note 14, 851 A.2d at 436.

27. Identifying information includes a registrant's name, aliases, date of birth, sex, race, height, weight, eye color, identifying marks and characteristics, driver's license number, social security number, law enforcement agency identification numbers, home address or expected place of residence, and any current or expected place of employment or school attendance. D.C.Code § 22–4007(a)(2); *see also* § 22–4014; *In re W.M., supra* note 14, 851 A.2d at 436.

must verify their addresses and other information annually, and in the case of lifetime registrants, quarterly.[28] Registrants have the option of verifying their information in person or through the mail, unless the sex offender is on parole, probation, supervised release, or must otherwise report to CSOSA, and CSOSA directs the offender to verify in person, in which case mail is not an option.

If registrants fail to verify their information through the mail in a timely manner, or submit inaccurate or incomplete verifications, CSOSA may direct them to appear in person. CSOSA also may direct registrants to appear in person for the purpose of taking a new photograph to document a significant change in physical appearance or to update a photograph that is five or more years old. Additionally, CSOSA is authorized to "direct that a sex offender meet with a responsible officer or official at a reasonable time for the purpose of complying with any requirement adopted by the Agency under this chapter." [29]

A sex offender who knowingly violates any provision of SORA is guilty of a misdemeanor punishable by a fine of not more than $1,000, imprisonment for not more than 180 days, or both.[30] Repeat offenders are subject to $25,000 fines, or up to five years in prison, or both.[31] Moreover, compliance with SORA and CSOSA re-

quirements is a mandatory condition of probation, parole, supervised release, and conditional release of any sex offender sentenced after the law took effect.[32]

In addition to the registration procedures outlined above, SORA provides for offense-based public dissemination of registrant information.[33] SORA authorizes the Metropolitan Police Department ("MPD") to provide both active and passive notification to the public concerning registered sex offenders. Active notification entails "affirmatively informing persons or entities about sex offenders" by any authorized means, including "community meetings, flyers, telephone calls, door-to-door contacts, electronic notification, direct mailings, and media releases." [34] For Class B offenders like Mr. Mitchell, the MPD may actively notify specific groups with particular needs for the information, such as schools and other organizations that serve vulnerable populations, victims and their families, and law enforcement agencies.[35]

Passive notification means making information about sex offenders available for public inspection or in response to inquiries.[36] This usually entails making such information available at police stations, responding to requests for information from the public, and posting offender information online.[37] Although SORA does not

---

28. D.C.Code § 22–4008(a)(1); 6A DCMR § 409.1.

29. *See* D.C.Code § 22–4007(b).

30. *See* D.C.Code § 22–4105(a).

31. *Id.*

32. D.C.Code § 22–4015(b).

33. Those required to register for life are in Class A. Ten-year registrants who have committed offenses against minors, wards, patients, or clients are in Class B. Other ten-year registrants are in Class C. *See* D.C.Code § 22–4011(b)(2)(A), (B), (C).

34. D.C.Code § 22–4401(b)(1)(A).

35. *See* D.C.Code § 22–4011(b)(3). For Class A offenders, MPD may provide active notification to "any person or entity."

36. Section 22–4011(b)(1)(B). Passive notification via Internet posting is limited to Class A and B offenders. § 22–4011(b)(3).

37. *Id.* Internet postings are limited to information regarding only Class A and B offenders.

specify what offender information may be disseminated to the public via active or passive notification, MPD's practice is not to publish everything.[38] Where any offender resides may only be identified by city block; precise addresses are not published.[39] The online registry's Frequently Asked Questions section states that "[u]nless the Courts have placed specific restrictions on the offender's release, he/she has the right to live wherever he/she chooses."[40] The site also cautions that "[u]nlawful use of this information to threaten, intimidate, harass, or injure a registered sex offender will not be tolerated and will be prosecuted to the full extent of the law."[41]

The provisions of SORA, and the restraints imposed by SORA, are far less restrictive than those imposed on, for example, the parolee, which the Supreme Court declared sufficiently burdensome so as to satisfy the "in custody" language of the federal habeas statute.[42] Mr. Mitchell is not "confined ... to a particular community, house, and job" by virtue of his obligation to register, and he would not need to seek permission before driving a car or traveling anywhere at any time.[43] Although he would have to periodically report to CSOSA, so long as he provides complete and accurate information, he could do so via the mail. Nor would Mr. Mitchell be required to permit the authorities into his home and workplace at any time of their choosing.

Mr. Mitchell's ability to move to a different community or residence would not be conditioned on approval by a government official, and his continued freedom would not depend on his ability to remain employed, nor would he be prohibited from engaging in any legal activities.[44] Registrants like Mr. Mitchell "remain 'free to move where they wish and to live and work as other citizens, with no supervision.' "[45] As such, the registration requirement amounts to a collateral consequence of conviction that is not itself sufficient to render an individual in custody.[46]

Furthermore, in the context of a constitutional challenge of SORA, we concluded that the law's "registration and notification scheme does not impose a significant affirmative disability or restraint. The law 'imposes no physical restraint,' nor does it 'restrain activities sex offenders may pursue.' "[47] Moreover, although registrants must, for example, "inform the authorities after they change their facial features (such as growing a beard), ... they are

**38.** *In re W.M., supra* note 20, 851 A.2d at 438.

**39.** *Id.*

**40.** District of Columbia Sex Offender Registry, available at http://mpdc.dc.gov/mpdc/cwp/view, a, 1241, q, 540522, mpdcNav-GID, 1532.asp (last visited July 10, 2009).

**41.** *Id.*

**42.** *See Jones, supra* note 10, 371 U.S. at 241–43.

**43.** *See id.* at 242, 83 S.Ct. 373.

**44.** *See Leslie, supra* note 17, 296 F.3d at 522.

**45.** *In re W.M., supra* note 14, 851 A.2d at 444 (quoting *Smith, supra* note 21, 538 U.S. at 100, 123 S.Ct. 1140) (rejecting comparison between sex offender registration and probation or supervised release). Moreover, registration, even if it must be done in person at the police station or CSOSA offices, does not constitute the type of severe, immediate restraint on physical liberty necessary to render an offender "in custody" for the purposes of § 23–110 relief. *See Henry v. Lungren,* 164 F.3d 1240, 1242 (9th Cir.1999).

**46.** *See Maleng, supra* note 12, 490 U.S. at 492, 109 S.Ct. 1923.

**47.** *In re W.M., supra* note 14, 851 A.2d at 444 (quoting *Smith, supra* note 21, 538 U.S. at 100, 123 S.Ct. 1140).

not required to seek permission to do so." [48] In other words, registrants are free "to do those things which in this country free men are entitled to do." [49] Although we have recognized that the "requirements of registration, verification and updating do impose a burden and may be irksome, they do not infringe significantly on [registrants'] basic liberties." [50] Additionally, violations of SORA obligations trigger a prosecution with all the same procedural safeguards in place for any other crime, unlike parole violations. [51]

Mr. Mitchell has served all the time he received for these crimes, and he cannot avail himself of § 23–110 by virtue of outstanding regulatory obligations to the government. We hold that an outstanding obligation to register under SORA does not sufficiently restrain a putative registrant's liberty so as to render him "in custody" within the meaning of § 23–110.

■ ■ Finally, the trial court ordered Mr. Mitchell to pay $150 to the Victims of Crime Compensation Fund within ninety days of his release from confinement. Mr. Mitchell argues in his reply brief that because this imposition of costs was noted as part of the Judgment and Commitment Order, and because he has yet to pay, he is still "in custody" by virtue of this obligation. Generally, "the imposition of a

fine ... is merely a collateral consequence of conviction, and does not meet the 'in custody' requirement." [52] "[C]ourts have held that orders of restitution, fines, and the revocation of medical and driver's licenses do not satisfy the 'in custody' requirement." [53] In *Michaud*, the appellant argued that he remained legally restrained because of a $60,000 fine he owed as a result of tax evasion convictions. [54] That indebtedness, he maintained, subjected him to potential further incarceration. [55] Recognizing the liberal construction of the custody requirement in federal habeas cases, the court noted that it had never been extended to a situation where a petitioner suffered no present restraint from a conviction. [56]

■ ■ We conclude that Mr. Mitchell has waived his argument pertaining to the assessment under the Victims of Violent Crime Compensation Act because he did not raise it in the trial court. [57] Even assuming Mr. Mitchell preserved this issue, however, where, as here, there is no present restraint on liberty resulting from a Superior Court sentence, the "in custody" requirement of § 23–110 would not be satisfied by an obligation to pay a fine. Mr. Mitchell's freedom of movement is entirely unaffected by virtue of having to

48. *Id.*

49. *Jones, supra* note 10, 371 U.S. at 243, 83 S.Ct. 373.

50. *In re W.M., supra* note 14, 851 A.2d at 450.

51. *See id.*

52. *Williamson, supra* note 17, 151 F.3d at 1183; *United States v. Segler*, 37 F.3d 1131, 1136–37 (5th Cir.1994); *United States v. Michaud*, 901 F.2d 5, 6 (1st Cir.1990) ("A monetary fine is not a sufficient restraint on liberty to meet the 'in custody' requirement."); *see also Spring v. Caldwell*, 692 F.2d 994, 999 (5th Cir.1982) (outstanding arrest warrant for failure to pay fine not a restraint on liberty).

53. *Virsnieks, supra*, 521 F.3d at 718 (citations omitted).

54. *See Michaud, supra* note 55, 901 F.2d at 6.

55. *Id.*

56. *Id.* (citing *Maleng, supra* note 12, 490 U.S. at 492, 109 S.Ct. 1923).

57. Arguments first raised in reply briefs come too late for appellate consideration. *Brawner v. United States*, 745 A.2d 354, 358 n. 3 (D.C. 2000) (citing *District of Columbia v. Patterson*, 667 A.2d 1338, 1346 n. 18 (D.C.1995); *Johnson v. District of Columbia*, 728 A.2d 70, 75 n. 1 (D.C.999)).

pay a fine. He would be free to go anywhere, with whomever he chooses, whenever he wants to go. The only imposition flowing from the fine is that Mr. Mitchell will have to transmit $150 to the Crime Victims Compensation Fund within ninety days of his release from prison. This is not an onerous burden, any more than paying rent or electricity bills is an onerous burden, and it does not constitute a severe restraint on liberty as would be required to satisfy the custody requirement of § 23–110.

In sum, we agree with the government that Mr. Mitchell's obligations under SORA do not render him "in custody" within the meaning of § 23–110, nor would his obligation to pay an assessment or fine. Therefore, the trial court lacked jurisdiction to hear his § 23–110 motion alleging ineffective assistance of counsel, and "we need not address whether the court erred substantively in denying the motion or whether it erred in refusing to hold a hearing on the matter." [58]

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

---

**58.** *Jeffrey, supra* note 13, 892 A.2d at 1126.