**Emery BODDIE, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 03–CF–31.

District of Columbia Court of Appeals.

Argued Nov. 23, 2004.

Decided Jan. 13, 2005.

---

REID, Associate J.

After a jury trial, appellant Emery Boddie was found guilty of unlawful possession with the intent to distribute a controlled substance (heroin) within a drug-free zone.[1] He filed a timely appeal, claiming that the trial court erred in denying his motion for judgment of acquittal. We affirm, and hold that to establish the applicability of D.C.Code § 33–547.1 (1998), recodified at § 48–904.07a (2001), the government need only prove beyond a reasonable doubt that the defendant possessed a controlled substance within the drug-free zone, or within 1,000 feet of a public or private school, with the intent to distribute it somewhere, not necessarily within the drug-free zone.

## FACTUAL SUMMARY

The government presented evidence during a suppression hearing and at trial in this case showing the following events. On the evening of January 2, 2002, around 6:44 p.m., Officer John Croson, a twelve-year plus veteran of the Metropolitan Police Department ("MPD") who was assigned to the vice unit, "received a telephone call from a reliable source." Officer Croson recognized the voice of an informant with whom he had worked previously around thirty times. The informant stated that a person "wearing a black leather jacket, blue jeans and a gray skull cap" "was holding and selling heroin in the park in the 300 block of K Street, in the Southeast quadrant of the District of Columbia.[2] The informant "had observed the [person] selling the narcotics." About ten minutes after he received the call from the infor-

Matthew C. Leefer, Boonsboro, MD, appointed by the court, for appellant.

Aaron H. Mendelsohn, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Barbara J. Valliere, and Brittain S. McInnis, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, REID, and GLICKMAN, Associate Judges.

---

1. He was sentenced to incarceration for a period of three years, followed by supervised release for five years, to be served consecutive to any other sentence.

2. Sgt. John Brennan of the MPD testified at trial that the Arthur Capper dwellings are located in "the 300 and 400 blocks of K Street, L, and also M Streets."

mant, Officer Croson and two other MPD officers arrived at the K Street location.

Upon his arrival at the designated place, Officer Croson saw "eight to ten subjects standing in the courtyard," one of whom "match[ed] the description" given by the telephone informant. When the person, later identified as Mr. Boddie, saw the unmarked vehicle carrying the police officers who were wearing plain clothes, he "stare[d] at [the] vehicle and start[ed] to walk towards [an] alley." Officer Croson followed Mr. Boddie into the alley, got out of his vehicle, and "stopped" him. The area in which Mr. Boddie was stopped is "a high drug area where [people] sell narcotics . . . ." A park in that area was known as "an open-air heroin market." [3] Officer Croson asked whether Mr. Boddie "had anything on him." Mr. Boddie said "he had a stem on him." [4] He also admitted that he had "a couple of bags on [him]." When the officer could not find any drugs in Mr. Boddie's pockets, he inquired whether Mr. Boddie had "anything in [his] pants." Mr. Boddie removed "a . . . plastic bag from his crotch area" and handed it to the officer. The bag contained 45 "green zip-lock[ ] bags with a white powder substance that field-tested positive for heroin." Mr. Boddie was placed under arrest.

Mr. Boddie testified at the suppression hearing. He maintained that he had gone to a corner liquor store in the K Street area, purchased a bottle of wine, and was sipping from it when he was stopped by three men who "jumped out of [a] car, [and] told [him to] put [his] hands up." He denied having a "stem" on his person, and said one of the men removed the bags of heroin from his pocket after telling him "they had got a call." Mr. Boddie claimed that he was not selling heroin but used the drug.

Officer Croson gave essentially the same account of the events leading to Mr. Boddie's arrest at trial as he did at the suppression hearing. [5] However, at trial, he was asked more extensive questions about the location where the events took place on January 2, 2002. He said that an elementary school was situated at the corner of Fifth and L Streets, S.E. He measured the distance between the location of the school and the place where Mr. Boddie was arrested; the distance was "549 feet, 10 inches." [6] One of the other officers who accompanied Officer Croson on the night of Mr. Boddie's arrest, Officer Smith, corroborated Officer Croson's account of the events.

Sergeant John Brennan, a thirty-one year veteran of the MPD, testified "as an expert in the distribution, sale, and use of narcotics in the District of Columbia, as well as the [MPD] procedures regarding drugs and safeguarding evidence." He stated that 24 of the bags possessed by Mr. Boddie contained a 31 percent concentration, and the other 21 bags a 23 percent concentration, with respect to the purity of the heroin. This compared with the average street concentration of "between 15

---

3. Sgt. Brennan indicated that this area is "a pretty notorious heroin market," and that sales of the drug take place almost "24 hours a day, 7 days a week."

4. At trial, Officer Michael Smith testified that "[a] stem is . . . like a tool . . . use[d] to clean a pipe" and Sgt. Brennan stated that "a stem is what they use to smoke cocaine with."

5. Officer Croson revealed at trial that Mr. Boddie had $93.00 in his right pocket at the time of his arrest.

6. Officer Croson indicated that he measured the distance by starting at "the Northwest corner" of the Van Ness Elementary School, "went west on L Street . . . directly back to where Mr. Boddie was arrested."

and 20 percent" purity. The typical user would have only one to three bags on his or her person at a time. As Sgt. Brennan stated, "Would a user have 45 bags for personal use; no. Never in my 31 years on the police force have I ever seen that." He explained that a dealer could give 45 bags to a person on the street, and inform that person that he or she "can make $660 . . ." and then give the dealer $400 while retaining $260. Or, the dealer could give the person the bags, most of which the person would sell while keeping "one or two or three bags for [his or her] own use."

## ANALYSIS

Mr. Boddie argues that the trial court erred by denying his motion for judgment of acquittal. In reviewing the denial of a motion for judgment of acquittal based on insufficiency of the evidence, we follow a familiar standard. "[W]e must view the evidence in [the] light most favorable to the government, recognizing the jury's province to weigh the evidence, determine the credibility of witnesses, and make justifiable inferences from the evidence." *Smith v. United States*, 777 A.2d 801, 810 (D.C.2001) (citation and internal quotations omitted). "Reversal for insufficiency of the evidence will be warranted only if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Id.* (citation and internal quotations omitted).

■ Mr. Boddie first maintains that the evidence was insufficient beyond a reasonable doubt to convict him because aspects of Sergeant Brennan's testimony did not support an inference of an intention to distribute, although the sergeant "rendered an opinion that [the] packaging of [a 45–bag] quantity of [heroin] could be considered suggestive of an intention to distribute it." He insists that the drugs he

had on his person were for his personal use, not for sale to others. The government argues that it "presented unrefuted expert testimony that the quantity and packaging of the heroin recovered from [Mr. Boddie were] more consistent with an intent to distribute than with personal use."

Based on the testimony of Sergeant Brennan, and viewing all the evidence in the light most favorable to the government, the jury could reasonably infer that Mr. Boddie possessed 45 bags of heroin with intent to distribute, rather than for his own personal use. Indeed, taken as a whole, Sgt. Brennan's testimony was consistent with the inference, obviously drawn by the jury, that Mr. Boddie did not possess the 45 bags for personal use. *See Taylor v. United States*, 662 A.2d 1368, 1371 (D.C.1995) ("An intent to distribute can be inferred from expert testimony and the possession of a quantity of drugs that exceeds a reasonable supply.") (citation omitted). Sgt. Brennan explained that a dealer might give a person bags of heroin to sell in exchange for part of the proceeds from the sales; or that a person might take the bags, sell most of them and keep one or two bags for personal use. He posed the question: "Would a user have 45 bags for personal use[?]" And, he answered his own question: "[N]o. Never in my 31 years on the police force have I ever seen that." Officer Croson's testimony also supported the inference, drawn from Sgt. Brennan's testimony, that Mr. Boddie possessed the 45 bags of heroin with intent to distribute. Officer Croson first observed Mr. Boddie in the park or courtyard at a housing area; the park was known "as an open air heroin market." Testing of the heroin in the 45 bags revealed a relatively high purity compared to that for the average street sale. Purity of the heroin and location of the defendant in

a high drug area are factors supporting an inference of possession with intent to distribute. *See Hinnant v. United States*, 520 A.2d 292, 294 (D.C.1987) (citations omitted). Viewed in the light most favorable to the government, "there is [·] evidence upon which a reasonable mind might fairly conclude ... beyond a reasonable doubt" that Mr. Boddie possessed the heroin for distribution rather than for personal use. *Smith, supra*, 777 A.2d at 810 (citation and internal quotations omitted).

 Mr. Boddie also contends that the government failed to establish that he intended to distribute drugs within a school or other drug-free zone. He argues that Officer Croson should have measured the distance between the elementary school and the place where the officers first saw him, rather than the place of his arrest, and hence, the government failed "to establish as an element of the [drug-free zone] offense that [he] intended to distribute drugs within a school or other drug free zone...." [7] He also asserts that: "In a case like this, to satisfy its burden of proof, the prosecution should be required ... to establish as an element of the offense that the accused intended to distribute drugs within a school or other drug free zone, not just that he was chased to it or through it." [8] The government maintains that: "Section 33–547.1 specifically prohibits 'possessing' with intent to distribute narcotics in a drug free zone ..., whether or not the heroin market itself· is in a drug free zone[ ]." Thus, the government insists that its burden was only to show that Mr. Boddie "possessed" the drugs within the drug-free zone, not that he intended to distribute· them within that zone.

We have never addressed the issue as to whether this penalty enhancement statute requires the government to show intent to distribute drugs in a drug-free zone, or whether it is sufficient under the statute if the government proves possession of a controlled substance within a drug-free zone with an intent to distribute them elsewhere. D.C.Code § 33–547.1(b) (Supp. March 2000) provides an enhancement penalty for "distributing or possessing with the intent to distribute a controlled substance which is listed in Schedule I, II, III, IV or V within a drug free zone." [9]

---

7. When Officer Croson arrived in the 300 block of K Street, S.E., he looked into "a public housing complex that has a courtyard with seating and looks like concrete sidewalks and a seating area." This area of the housing complex is sometimes referred to as "a park." Officer Croson saw the eight to ten individuals, including Mr. Boddie "all in the park area." Officer Croson was in his vehicle "traveling eastbound, looking out of his vehicle, and they were south of [him] in the park—25, 30 feet, maybe a little more." The alley where Mr. Boddie was stopped by Officer Croson was located "[c]loser to Fourth Street, just past the park on the south side." Given the proximity of the alley to the park, and the fact that the alley was only approximately 549 feet 10 inches from the Van Ness school, reasonable jurors could reasonably infer that the park where Officer Croson first saw Mr. Boddie also was within 1000 feet of the Van Ness school.

8. The evidence presented in this case does not support Mr. Boddie's assertion that he was "chased" into or through the drug-free zone. Rather, Officer Croson testified that when Mr. Boddie saw and stared at the vehicle in which the officer was riding, Mr. Boddie began to "walk towards [an] alley"; Officer Croson followed him into the alley. In addition to the fact that this is not a case where appellant was chased into or through a drug-free zone, it is also not a case in which the appellant was within the drug-free zone incidentally, such as when a train passes through that zone.

9. Recodified at D.C.Code § 48–904.07a (b) (2001). The entire section provides that:

 (a) All areas within 1000 feet of a public or private day care center, elementary school, vocational school, secondary school, junior college, college, or university, or any

Section 33–547.1 is comparable to the corresponding federal penalty enhancement statute, 21 U.S.C. § 860(a) (which, among other acts, addresses "possessing with the intent to distribute"), *see United States v. Dimas*, 3 F.3d 1015, 1022 (7th Cir.1993) ("[The comparable federal drug-free zones] statute merely enhances the penalty for crimes occurring in a certain location . . . .").[10]

In 1994, the Council of the District of Columbia considered and enacted legislation designed to protect children from "the presence of drugs." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 10–506, "YOUTH FACILITIES DRUG FREE ZONE AMENDMENT ACT OF 1994,"("Council Report"), September 28, 1994, at 2. The Council noted: "There are few places where a child can escape the presence of drugs. Whether at home, at school, or at play, too many children are unable [to] escape the shadow of drugs and drug deals." In describing what the proposed legislation would do, the Council Report stated:

> public swimming pool, playground, video arcade, youth center, public library, or in and around public housing, as defined in section 3(1) of the United States Housing Act of 1937, approved August 22, 1974 (88 Stat. 654; 42 U.S.C. § 1437a(b)), the development or administration of which is assisted by the United States Department of Housing and Urban Development, or an event sponsored by any of the above entities shall be declared a drug free zone.
> (b) Any person who violates § 48–904.01(a) by distributing or possessing with the intent to distribute a controlled substance which is listed in Schedule I, II, III, IV, or V within a drug free zone shall be punished by a fine up to twice that otherwise authorized by this chapter to be imposed, by a term of imprisonment up to twice that otherwise imposed, or both.

**10.** The federal statute provides in pertinent part:

Bill 10–506 would create a 1000–foot drug free zone around educational and recreational sites where children are likely to assemble, very similar to the gun free zone created under D.C. Act 10–233, the Youth Facilities Firearm Prohibition Amendment Act of 1994." Bill 10–506 would create a contiguous drug free zone in the same areas. Like D.C. Act 10–233, it is the intent of this bill to cover most places where children are intended to congregate. This includes schools and recreation areas like playgrounds, video arcades, and youth centers, or events sponsored by these entities. Bill 10–506 would also create an enhanced penalty for drug violations within a "drug free zone," permitting persons to be sentenced up to twice the penalty otherwise authorized by law.

*Id.* When the Council amended § 33–547.1 in 1998 by adding the phrase "public library" to the listing in subsection (a), the Council noted that the statute addresses "[a] person who is convicted of the distribution of or possession with intent to distribute a controlled substance within a

> (a) Penalty. Any person who violates section 401(a)(1) or section 416 [21 USCS § 841(a)(1) or 856] by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or private elementary, vocational, or secondary school or a public or private college, junior college, or university, or a playground, or housing facility owned by a public housing authority, or within 100 feet of a public or private youth center, public swimming pool, or video arcade facility, is . . . subject to (1) twice the maximum punishment authorized by section 401(b) [21 USCS § 841(b)], and (2) at least twice any term of supervised release authorized by section 401(b) [21 USCS § 841(b)] for a first offense . . . .
> 21 U.S.C. § 860(a).

drug free zone...." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 12–10, the "LIBRARY DRUG FREE ZONE AMENDMENT ACT OF 1998," February 25, 1998, at 3.

Mr. Boddie relies on three federal District court cases in asserting that D.C.Code § 33–547.1 requires proof that he intended to distribute the heroin on his person within the drug-free zone: *United States v. Testa,* 768 F.Supp. 221 (N.D.Ill. 1991); *United States v. Coates,* 739 F.Supp. 146 (S.D.N.Y.1990); and *United States v. Roberts,* 735 F.Supp. 537 (S.D.N.Y.1990). However, several federal circuits have not followed these District court decisions. Rather, they have adopted the view espoused by the government in this case, that the comparable federal statute prohibits possession of drugs within the drug-free zone with intent to distribute them anywhere. In 1992, the Third Circuit followed the Fifth Circuit's lead in interpreting 21 U.S.C. § 860(a). The Fifth Circuit had "construe[d] the statute to proscribe possession, within 1,000 feet of a school, of a quantity [of drugs] sufficient to indicate intent to distribute (felony possession)." *United States v. Wake,* 948 F.2d 1422, 1430 (5th Cir.1991). The Third Circuit in *United States v. Rodriguez,* 961 F.2d 1089 (3d Cir.1992),discerned "major flaws ... in all ... of the arguments on which the[ ] [District Court] decisions [mentioned above] were based."

*Rodriguez* first examined the language of the federal statute and explained why it followed *Wake*'s interpretation:

[W]e believe that this interpretation is supported by the language of the schoolyard statute. This provision applies to three types of criminal conduct: distributing drugs, possessing drugs with intent to distribute, and manufacturing drugs. In cases involving the distribution or manufacture of drugs, it is clear that this provision requires that the *actus reus* must occur within 1000 feet of a school. Accordingly, it is reasonable to interpret the statute as applying in the same way to the offense of possession with intent to distribute. Since the *actus reus* for this offense is possession, it follows that possession of the drugs, not the intended location for distribution, must be located within 1000 of a school.[11]

*Id.* at 1092. The *Rodriguez* court found support for its interpretation of the statute in the legislative history. It determined that: "Congress made clear that it did not wish to confine the schoolyard statute to cases in which a defendant distributes or intends to distribute drugs near a school. Rather, Congress was more broadly concerned about serious drug crimes that occur in proximity to schools." *Id.* The court pointed to language used when the Chairman of the Senate Judiciary Committee, on behalf of the Committee, introduced the 1988 amendment to the federal statute which prohibited "possession with intent to distribute." *Id.* The Chairman stated: "This section adds 'possession with intent to distribute' to the list of offenses covered by this statute *so that the enhanced penalties would apply to someone apprehended near a school with a quantity of drugs*

---

11. Thus, unlike the District's statute, the federal statute focuses on "manufacturing drugs," in addition to "distributing" and "possessing drugs with intent to distribute." The District and federal statutes are comparable, however, in that the *"actus reus"* with respect to "possessing drugs with intent to distribute" is "possession." Hence, we are unpersuaded by appellant's contention during oral argument that case law interpreting 21 U.S.C. § 860(a) should not be followed because the District's statute does not include "manufacturing," as does the federal statute.

*sufficient to indicate an intention to distribute."* *Id.* (citations omitted). Based upon this legislative history, the *Rodriguez* court concluded:

> This analysis provides clear evidence that Congress did not intend to require proof of an intent to distribute drugs near a school. When a defendant is found in possession of a sufficiently large quantity of drugs, an intent to distribute may logically be inferred from the quantity of drugs alone. By contrast, more evidence is logically required before an inference may be drawn concerning the location where the defendant intended to distribute the drugs. The statement endorsed by [the Chairman of the Senate Judiciary Committee] and his colleagues clearly shows, however, that they did not think that the schoolyard provision required any such additional evidence. Rather, they wanted the schoolyard provision to apply whenever a defendant is 'apprehended near a school with a quantity of drugs sufficient to indicate an intention to distribute.' This statement thus provides clear evidence that proof of an intent to distribute near a school is not necessary.

*Id.* at 1092–93 (citations omitted). After having decided "that the phrase 'within one thousand feet' modifies 'distributing' and 'manufacturing,' as well as 'possessing with intent to distribute,'" *id.* at 1093, and following further analysis, the *Rodriguez* court held "that the schoolyard statute applies to a defendant who possesses drugs within 1,000 feet of a school with the intent to distribute those drugs at any location," *id.* at 1095.[12]

The D.C. Circuit also has spoken on the issue as to "whether [the federal statute, 21 U.S.C.] § 860(a) requires the prosecu-

tion to prove not only possession of the drugs within the school zone, but also intent to distribute them there." *United States v. McDonald,* 301 U.S.App. D.C. 157, 991 F.2d 866, 867 (D.C.1993). It "h[e]ld that the 'one thousand feet' language in § 860(a) qualifies 'possessing' rather than 'to distribute.'" *Id.* at 869. It did not consider the legislative history cited by the *Rodriguez* court to be "particularly persuasive" and "therefore place[d] no stress on legislative history." *Id.* at 870. And, it did not believe that the "rule of lenity" "furnishes any assistance." *Id.* Rather, it relied on the language and purpose of § 860(a). It concluded that the "one thousand feet" language "appears to be aimed, not at any verbs ..., but at the section's verbal nouns, its gerunds." *Id.* at 869. This conclusion led the D.C. Circuit to interpret the prohibitions on "distributing," "manufacturing," and "possessing" in an internally consistent manner, all requiring treatment "twice as serious in terms of maximum punishment." *Id.* Thus, "when the 'possessing' is done near a school, § 860(a) also renders the crime twice as serious. Under this interpretation it is irrelevant whether the defendant had in mind any particular location for doing his distributing or whether, if he did, the spot was near a school." *Id.* Turning to the purpose of the statute, the D.C. Circuit stressed the legislative "desire to give students increased protection from the violence often accompanying serious drug offenses, and from the threat of having their lives corrupted through proximity to drug traffickers and their wares." *Id.* (citations omitted). Although the D.C. Circuit recognized that a distinction could be made between "traffickers intending to distribute drugs near a school ... [and] traffick-

---

12. Although the appellant in *Rodriguez, supra,* argued that the statute was ambiguous and therefore the rule of lenity should apply, the court declared that the statute was not ambiguous and therefore it "need not confront this issue." 961 F.2d at 1094.

ers bent on selling across town," it asserted that "[a]s to the crime of possession with intent to distribute, the distinction § 860 makes is between those who violate [21 U.S.C.] § 841(a)(1) inside the school zone and those who violate § 841(a)(1) elsewhere. Because they endanger students, the former commit the more serious offense, and § 860 thus makes their potential punishment more severe." *Id.* at 869–70.

The Sixth Circuit briefly construed § 860 in *United States v. Lloyd,* 10 F.3d 1197 (6th Cir.1993), in a manner consistent with that of other federal circuits:

> Under 21 U.S.C. § 860 ... a district court may double the penalty for anyone found to have distributed cocaine in violation of section 841(a), where that person sold the cocaine within 1,000 feet of a school. This court has interpreted this statute as not incorporating any *mens rea* requirement, *United States v. Cross,* 900 F.2d 66, 68–69 (6th Cir.1990); thus, the jury did not need to find an intent on [the defendant's] part to deliver drugs within 1000 feet of the school.

*Id.* at 1218. In 1998, the First Circuit joined the Fifth, Third, District of Columbia Circuit, and the Sixth Circuit in interpreting § 860(a). *See United States v. Ortiz,* 146 F.3d 25 (1st Cir.1998). It described the district court decisions on which the appellant in this case relies as "unpersuasive," *id.* at 29, and interpreted the statute as prohibiting within 1,000 feet of a school "distributing," "manufacturing" and "possess[ion] with intent to distribute" a controlled substance. *Id.* The First Circuit addressed the reasoning of the district courts in *Testa* and *Coates, supra,* declaring that "if § 860(a) were read to require only that the place of possession be within a school zone, regardless of the place of intended distribution, the statute would unfairly sweep into its ambit cases involving no increased risk to students." *Id.* Stressing, in part, the potential harm to children of the presence of drugs within a school zone, the First Circuit reasoned:

> If we require proof of intent to distribute only within the school zone, as these district courts did, the statute would exclude many cases where the presence of drugs, in fact, increased the risk of harm to students. In view of the danger that the mere presence of drugs near a school presents, the district courts' interpretation would provide an escape-hatch for a defendant when, as here, the government is unable to establish precisely where the drugs were meant to be distributed, thereby defeating the intent of Congress. In many such cases, school zone distribution may even be intended but proving this may be difficult. Certainly, the mere existence of a large quantity of drugs in an area increases the possibility of gang warfare and gunfire and other drug-related violence in that vicinity.

*Id.* Even though the appellant urged the court to apply the rule of lenity, the First Circuit declined to do so. It deemed the appellant's interpretation of § 860(a) "arguably plausible," but "not cogent." *Id.* at 29–30 (citation and quotation omitted). It relied on the D.C. Circuit opinion in *McDonald, supra,* and concluded that: " 'Whatever uncertainty of meaning exists [with respect to § 860(a) ], it is far from 'grievous,' an essential condition for applying the [rule of lenity].' " *Id.* at 30 (quoting *McDonald, supra,* 991 F.2d at 870–71) (other citation omitted).

Finally, in 2002, the Tenth Circuit, consistent with the other circuits discussed above, "h[e]ld that to obtain a conviction under § 860(a) for possession with intent to distribute, the government need only prove that the defendant possessed illegal drugs within 1,000 feet of a school and

intended to distribute them *somewhere.*" *United States v. Harris,* 313 F.3d 1228, 1240 (10th Cir.2002). The basis for this conclusion was three-fold. First, the Tenth Circuit "agree[d] ... that because § 860(a) does not have a *mens rea* requirement, a jury need not find intent on the part of a defendant to distribute illegal drugs within 1,000 feet of a school." *Id.* at 1239 (citing *Lloyd, supra,* 10 F.3d at 1218; *Wake, supra,* 948 F.2d at 1432) (other citation omitted). Second, the Tenth Circuit "agree[d] with the First, Third, and District of Columbia Circuits that the plain language of the statute support[ed][its] holding." *Id.* (citations omitted). Third, the Tenth Circuit adopted the view of these same circuits "that the inclusion of 'manufacturing' drugs within 1,000 feet of a school as an offense under § 860(a) indicates Congress's concern with the mere presence of large quantities of illegal drugs near schools, not just their distribution near schools." *Id.* (citations omitted). In addition, the Tenth Circuit also determined that the rule of lenity was "[in]applicable unless there is a grievous ambiguity or uncertainty in the language and structure of the [statute] such that even after a court has seized every thing from which aid can be derived, it is still left with an ambiguous statute"; in this case no such grievous ambiguity exists. *Id.* at 1240 (quoting *Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)) (internal citations, quotation marks, and modifications omitted).

We turn now to the District's statute, D.C.Code § 33–547.1(a) and (b), recodified at D.C.Code § 48–904.07a.(a) and (b). While there are some obvious differences between the District's statute and the federal § 860(a), such as the District's prohi-

bition of "distributing" and "possession with intent to distribute" but not "manufacturing," the critical controlling language in the District's statute is virtually identical to that in the federal law, and we see no need to deviate from the federal circuits' interpretation of that language. Section 860(a) forbids "distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, ... a public or private ... school." D.C.Code § 48–904.07a (a) provides that "[a]ll areas within 1000 feet of a public or private ... school ... shall be declared a drug free zone," and § 48–904.07a (b) precludes "distributing or possessing with intent to distribute a controlled substance ... within a drug free zone." While Mr. Boddie's interpretation of our statute is "arguably plausible," *Ortiz, supra,* we conclude that it is neither persuasive nor the correct construction, given the absence of a *mens rea* requirement in § 48–904.07a (b) specific to any intended place of distribution," and in light of the legislature's overriding concern with the harm that the presence of drugs in a school zone can bring to children. Thus, like the federal circuits, we conclude that the geographic location, "within a drug free zone" or within 1,000 feet of a public or private school, modifies "possessing with the intent to distribute," as that language is used in § 48–904.07a (b), *see Rodriguez, McDonald, Lloyd, Ortiz, Harris, supra,* and we hold that the government need only prove beyond a reasonable doubt that the defendant possessed a controlled substance within the drug-free zone, or within 1,000 feet of a school, with the intent to distribute it somewhere, not necessarily within the drug-free zone.[13]

**13.** Moreover, a broad interpretation of the penalty subsection of § 48–904.07a would help effectuate the declaration in subsection (a) of this section that all the covered areas

(1000 feet around educational institutions, day care centers, playgrounds, etc.) are to be "drug-*free* zones". D.C.Code 48–904.07a (a) (emphasis added).

Since the government's evidence here established beyond a reasonable doubt that Mr. Boddie possessed the 45 bags of heroin within the drug-free zone, or within 1,000 feet of the Van Ness Elementary School, with the intent to distribute them, the place where the police initially observed him, is irrelevant.

Our holding is supported by the legislative history of § 48–904.07a.[14] As the Council Report on the bill leading to this statute made clear: "There are few places where a child can escape the presence of drugs. Whether at home, at school, or at play, too many children are unable [to] escape the shadow of drugs and drug deals." Council Report, September 28, 1994, at 2. The Council undoubtedly, then, intended that § 904.07a be construed in a manner that recognizes the harm that can befall children due to the mere presence of drugs in a school zone. Our reading of the statute is consistent with the legislative intent, and with the federal circuits' interpretation of virtually identical controlling language. Furthermore, since we see no "grievous ambiguity or uncertainty in the language and structure of [§ 904.07a]," this is not a case for the application of the rule of lenity. *Harris, supra,* 313 F.3d at 1240.

Accordingly, because the evidence was sufficient beyond a reasonable doubt to convict Mr. Boddie of the charged offense, we affirm the judgment of the trial court.

*So ordered.*

---

**14.** It is also instructive to note that the District's drug-free zone statute is in *pari materia* with the enlistment-of-a-minor statute, D.C.Code § 48–904.07 (2001), previously codified at D.C.Code § 547 (1981). In *Outlaw v. United States,* 604 A.2d 873 (D.C.1992), we held that the enlistment-of-a-minor statute requires no proof that the enlister knew the enlistee was under 18 years of age, in part, because "to impose this requirement on the government would be quite inconsistent with the legislative intent to compound punishment for those who distribute drugs to minors or employ them in distribution." *Id.* at 876 (citation omitted). In addition, as in this case, we looked to the interpretation of comparable federal legislation in interpreting the statute at issue in *Outlaw. Id.* ("Not surprisingly, federal courts construing the similar federal statute punishing use of a minor to distribute drugs have also found no requirement that the defendant know the person employed was under age.") (citations omitted).