# United States Court of Appeals
## For the First Circuit

No. 16-1766

UNITED STATES OF AMERICA,

Appellee,

v.

MUKONKOLE HUGE KIFWA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Torruella, Selya and Kayatta,
Circuit Judges.

David Shaughnessy on brief for appellant.
Richard W. Murphy, Acting United States Attorney, and Renée
M. Bunker, Assistant United States Attorney, on brief for appellee.

August 22, 2017

**SELYA**, **Circuit Judge**.  It takes a certain degree of effrontery for an accused person held in pretrial detention to continue to conduct his criminal enterprise over a prison telephone, knowing that prisoner calls are customarily recorded. But defendant-appellant Mukonkole Huge Kifwa did just that, relying on the masking effect of his use of a language (Lingala) seldom heard in the United States.  That reliance was misplaced, and even though the appellant moved unsuccessfully to exclude the government's introduction of the translations of four of the recorded conversations at trial, he declined the district court's invitation to ask for a continuance.  The jury found him guilty as charged, and the court sentenced him to serve forty-six months in prison.

The appellant now exhorts us to vacate his conviction and sentence.  Discerning no merit in the appellant's exhortations, we affirm the judgment below.  We do, however, dismiss without prejudice one of his claims of error.

I.  BACKGROUND

We briefly rehearse the relevant facts and travel of the case.  The appellant is a citizen of the Democratic Republic of the Congo (DRC) who entered the United States in February of 2014 on a non-immigrant diplomatic visa (purporting to be an employee of the DRC government).  This fiction began to unravel when — in March of 2015 — federal authorities commenced an investigation

into the appellant's financial machinations, sparked by complaints about bad checks. The probe led to the appellant's arrest in July and his indictment (by a federal grand jury sitting in the District of Maine) on a number of bank-fraud charges. The government's investigation continued, and — in November of 2015 — the grand jury handed up a superseding indictment, charging the appellant with visa fraud, see 18 U.S.C. § 1546(a); possession of firearms by a non-immigrant alien, see id. §§ 922(g)(5)(A), 924(a)(2); bank fraud, see id. § 1344; and making materially false statements to a government agency, see id. § 1001(a)(2).

About a month before the anticipated trial date, the district court held a hearing to determine the appellant's translation needs. The appellant explained that he speaks Lingala, French, and English (though he is more comfortable in French than English). The appellant confirmed that he did not need Lingala translation but instead requested and secured French translation for trial.

Toward the end of the hearing, the prosecutor stated that she and defense counsel had just begun discussing the possibility that the government might use at trial the substance of certain telephone calls that the appellant had made from jail while in pretrial detention. She explained that the appellant had

"made an extraordinarily large number of calls" from jail.[1] Each call was fifteen minutes or less in duration, and at least two-thirds of the approximately 1200 calls were in Lingala. Like all personal calls made by prisoners from the jail, the appellant's calls had been recorded. The prosecutor told the court that the government was still in the process of identifying the relevant conversations and requesting the recordings.

Following this hearing, the government requested that the jail turn over recordings of roughly 285 to 300 calls. Promptly upon receiving these recordings, the government gave defense counsel a computer disc containing the audio files. Approximately two weeks later, the government (with Mintela's assistance) winnowed out fifteen calls as prime candidates for translation. The government contemporaneously notified defense counsel and singled out the relevant calls (all previously produced) by their identification numbers.

At that point, the government's efforts hit a snag: it experienced great difficulty in locating a Lingala translator. Eventually, though, the government was able to hire a Lingala translator in Boston who worked "around the clock" to translate

---

[1] The government did not learn of the existence of these calls by happenstance. Seemingly unbeknownst to the appellant, Eddy Mintela (an associate whom the appellant frequently called from jail) had begun working with the prosecution as a cooperating witness.

and transcribe the fifteen calls.  The government turned over the English-language transcripts on a rolling basis as it received them from the translator.  The translator finished the final transcript around midnight on the evening before the trial was set to start, and the government gave it to the defense the next morning.

The appellant objected to the government's proposed use of the translations at trial, but he did not ask for a continuance despite the district court's apparent willingness to grant one. The court proceeded to deny the motion to exclude, but it ordered the government to show defense counsel the particular transcripts that it planned to use before calling any witness whom it intended to query about matters involving the transcribed conversations. The trial began as scheduled.

During the trial, the government entered four of the transcripts (totaling five pages of text) into evidence.  In the government's view, the four transcripts showed the appellant asking Mintela to forge DRC name-change documents and create a story to bolster a bogus asylum claim.  The government also presented testimony from Mintela himself as well as testimony from various immigration officials (who described several discrepancies and inaccuracies in the appellant's visa documentation).  In addition, representatives of various banks described the

appellant's penchant for passing bad checks and attempting to cash counterfeit checks.

Following four days of trial, the jury found the appellant guilty on all counts. The district court imposed a forty-six-month sentence for each count, to run concurrently. This timely appeal ensued.

## II. ANALYSIS

Before us, the appellant — who is represented by new counsel on appeal — argues that the district court should have granted his motion to exclude the transcripts, that their introduction unfairly prejudiced him, and that his trial counsel was ineffective. We discuss the first two of these claims together and then turn to the ineffective assistance of counsel claim.

We start with the transcripts, which involved a quartet of recorded calls. Because the appellant seasonably moved to exclude them below, his first two claims of error are preserved. See United States v. Lemmerer, 277 F.3d 579, 586 n.2 (1st Cir. 2002). Consequently, we review the district court's rulings concerning the transcripts for abuse of discretion. See United States v. Perez-Ruiz, 353 F.3d 1, 10 (1st Cir. 2003).

In criminal cases, the government has broad disclosure obligations. See United States v. Huddleston, 194 F.3d 214, 222 (1st Cir. 1999); see also Fed. R. Crim. P. 16(a). Those obligations have teeth: the government's suppression of evidence

favorable to the accused violates due process. See Brady v. Maryland, 373 U.S. 83, 87 (1963).

Furthermore, the government's disclosures must be made in a timely manner. See United States v. Chaudhry, 850 F.2d 851, 858 (1st Cir. 1988). Typically, litigants offer recordings as evidence and use transcripts as interpretive aids for the jurors' benefit. See United States v. Cintolo, 818 F.2d 980, 1004 n.15 (1st Cir. 1987). The recordings control in the event that they differ from the proffered transcripts. See id. Foreign-language recordings, however, are treated differently. For commonsense reasons, "play[ing] foreign language tapes endlessly to an uncomprehending jury" is not required. Chaudhry, 850 F.2d at 856.

As a result, the parties may agree to forgo having jurors listen to foreign-language recordings that they do not understand. See United States v. Rengifo, 789 F.2d 975, 983 (1st Cir. 1986). In such circumstances, transcripts containing translations of such recordings may be admitted into evidence as long as they are reliable and properly authenticated. See United States v. Morales-Madera, 352 F.3d 1, 8-9 (1st Cir. 2003); Rengifo, 789 F.2d at 983. When dealing with translations of foreign-language recordings, the transcripts ordinarily must be divulged to defense counsel sufficiently in advance of trial to allow him to assess their accuracy, raise objections, and craft an informed defense

strategy.  See United States v. Flecha-Maldonado, 373 F.3d 170, 177 (1st Cir. 2004); Morales-Madera, 352 F.3d at 8.

If disclosure is delayed without any suggestion of bad faith on the government's part, "the critical inquiry is . . . whether the tardiness prevented defense counsel from employing the material to good effect."  United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990); see Chaudhry, 850 F.2d at 858-59.  In conducting this inquiry, "a court's principal concern must be whether learning the information altered the subsequent defense strategy, and whether, given timeous disclosure, a more effective strategy would likely have resulted."  Devin, 918 F.2d at 290.

To vacate a conviction on grounds related to a disclosure delayed without bad faith, we must be convinced of "a reasonable probability" that the result of the proceeding would have been different had the defendant received the discovery in a timely manner.  Perez-Ruiz, 353 F.3d at 8-9.  In other words, a defendant must demonstrate prejudice before we can overturn his conviction.  See United States v. Montoya, 844 F.3d 63, 71 (1st Cir. 2016), cert. denied, 137 S. Ct. 1832 (2017); United States v. Sepulveda, 15 F.3d 1161, 1178-79 (1st Cir. 1993).  The burden is on the defendant to prove prejudice.  See Devin, 918 F.2d at 290.

Against this backdrop, we turn to the case at hand.  To begin, we have doubts that the lag in disclosure actually constituted a discovery violation.  In the absence of any undue

delay in securing transcription, the government's disclosure obligation ordinarily does not mature until a particular transcript comes into existence. See Chaudhry, 850 F.2d at 859; see also United States v. Amaya-Manzanares, 377 F.3d 39, 42-43 (1st Cir. 2004) (explaining that government's disclosure obligation did not extend to document that did not yet exist). Here, the prosecutor provided the recordings (and, later, the translations) to defense counsel as soon as she received them. Nor does the record disclose the slightest inkling of bad faith. The opposite is true: the record strongly suggests diligent and open communication between counsel. Cf. Chaudhry, 850 F.2d at 859 (discussing issue of good faith and noting absence of evidence that prosecution "was fatally unassiduous in preparing the document, or that it squirrelled the new transcript away for a period of time"). So, too, the record reveals a wholly innocuous explanation for the government's delay in obtaining translations: the relevance of the telephone calls only became apparent late in the game, a large number of calls had to be appraised, and Lingala translators proved to be hen's-teeth rare.

Over and above the absence of any showing of bad faith, the appellant has failed to explain convincingly how the admission of the transcripts prejudiced him. After all, the appellant was a party to all of the telephone conversations and, thus, must have been aware of their contents. What is more, the conversations

were not retrieved from the distant past; the calls had been placed by the appellant while awaiting trial. It is fair to presume that the appellant remembered the contents of the calls (at least, in general terms).

In the same vein, the government shared the recordings of the telephone calls with the defense when they were first obtained. Thus, the appellant had the opportunity to listen to them weeks prior to trial. Although defense counsel did not speak Lingala, the appellant indisputably did. His lengthy trial testimony in English (albeit with occasional assistance from a French translator) convinces us that he would have been able, at the very least, to summarize the contents of the recordings for his attorney's benefit.[2]

We also think it noteworthy that the appellant has neither identified any specific inaccuracies in the government's translations nor pointed to any specific piece of information as a source of unfair surprise. This lack of specificity has special significance because whether or not the appellant had adequate time to review the translations before trial, he surely had adequate time to review them when preparing his brief on appeal.

---

[2] While this kind of bare bones notice is not ideal, it is one factor, among many, that pushes back against the appellant's conclusory claim of unfair prejudice. Cf. Flecha-Maldonado, 373 F.3d at 178 (discerning no prejudice when defense counsel was "not completely ignorant" of contents of recordings because he independently obtained informal translations before trial).

We add, moreover, that this case does not exhibit any of the familiar telltales of prejudice. For example, one way of evaluating potential prejudice from delayed disclosure is to "evaluate how well defense counsel was able to use the information despite the delay." United States v. Osorio, 929 F.2d 753, 758 (1st Cir. 1991). Here, the appellant made a valiant (though unconvincing) attempt to refute the government's interpretation of the recordings at trial. In the most coherent discussion of potential translation error, the prosecutor asked the appellant about a transcript excerpt:

> [APPELLANT]: I need one paper (document) because they haves all papers. One letter written by the Foreigner Affairs Department, testifying that I work there, as you poses my labor serial number.
> MINTELA: Okay, no problem.
> [APPELLANT]: If you can do it for me, that paper is always sign by our General Secretary. You need to steal the seal and use it.
> MINTELA: Ummm.
> [APPELLANT]: Is just one confirmation letter predating it two days ago.
> MINTELA: Yes, yes I understand.
> [APPELLANT]: Add the Foreign affairs Ministry's address.
> . . .
> [APPELLANT]: Thank you very much . . . . Is just to confirm that I'm one of their agent. I'm an agent at the Bureau of Etudes, Foreign Affairs Ministry.

(Errors in original). When asked what he meant by "steal the seal," the appellant said that he was merely asking Mintela to go to the DRC embassy to obtain information about the appellant's

identity and blamed the negative connotations attached to the word "steal" on translation error. Even so, he did not explain the other suspicious parts of the excerpt, such as specifying that the letter should be predated — and he offers no explanation now.

There are, of course, other ways in which prejudice may be shown. Of particular pertinence for present purposes, prejudice sometimes may be demonstrated by indicating "plausible strategic option[s] which the delay[ed disclosure] foreclosed." Devin, 918 F.2d at 290. The appellant tries to reach this safe harbor, arguing that he either would have elected not to testify or would have pursued a plea bargain had he received the translations earlier. When faced with what purported to be his own words, he says that he "had no choice" but to attempt to explain himself (and, thus, to testify).

It may be that the substance of the calls had some modest influence in the appellant's election to testify. We fail to see, though, how the timing of the receipt of the transcripts could have affected this decision. As noted above, the appellant had access to the recordings weeks before trial. To cinch matters, the translations themselves were in his hands before he took the stand (indeed, before the start of trial). Knowing of the contents of the recordings at least in general terms, he and his counsel had sufficient information on which to base the appellant's decision about whether to testify.

The appellant's suggestion that he might have chosen to enter a guilty plea if he had the translations beforehand stands on no firmer footing. Even assuming that forgoing the opportunity to enter into a plea agreement is a cognizable form of prejudice in a delayed disclosure case, see Flecha-Maldonado, 373 F.3d at 178, the government presented a wide range of witnesses and documentary evidence — known in advance to the appellant — to focus the jury's attention on the suspicious discrepancies in the appellant's visa paperwork, his erroneous statements to immigration officers, and his pattern of illegitimate financial dealings. The translations of the four recorded conversations added little to the mix: they were but the cherry on the sundae.

The sockdolager, of course, is that the appellant never asked for a continuance when the disclosure was made. Although this omission does not wholly pretermit his claim of error, see Lemmerer, 277 F.3d at 586 n.2, it renders the likelihood of prejudice extremely doubtful. As we have said, "[a]s a general rule, a defendant who does not request a continuance will not be heard to complain on appeal that he suffered prejudice as a result of late-arriving discovery." Sepulveda, 15 F.3d at 1178.

This failure is particularly striking for two reasons. First, the turnover of the four transcripts occurred before trial had started, so a continuance would almost certainly have been a complete panacea. Second, the district court asked the appellant

if he wanted a continuance and the government said it had no objection to one. Yet, the appellant turned a deaf ear to this suggestion. Where, as here, a defendant spurns a continuance that would have cured the adverse effects of a delayed disclosure, a claim of prejudice will not lie. See United States v. Candelaria-Silva, 162 F.3d 698, 703 (1st Cir. 1998).

To sum up, we conclude — after canvassing the record and weighing all the appellant's arguments — that the appellant has not carried his burden of showing that the delayed disclosure caused him any unfair prejudice. Here, there is simply no reason to believe that "learning the information altered the subsequent defense strategy," or that "given timeous disclosure, a more effective strategy would likely have resulted." Devin, 918 F.2d at 290. It follows that the district court did not abuse its discretion in denying the appellant's motion to exclude the four translations.

The appellant has a fallback argument: he faults the district court for not making explicit findings anent prejudice and bad faith. However, a failure to make subsidiary findings in connection with an evidentiary ruling, without more, is ordinarily not a basis for remand. Everything depends on context. Here, this panoply of factors weighs heavily against a finding of abuse of discretion. The record, viewed in context, makes manifest that the district court reasonably concluded both that the government

was operating in good faith[3] and that the appellant was not blindsided by the transcripts. And because the basis for the district court's conclusions is evident, more detailed findings were not required.

Finally, the appellant asserts that his trial counsel was ineffective. In his view, his trial counsel represented him poorly because, among other things, the lawyer failed to request a continuance when the translations surfaced.

This claim of error is raised for the first time on appeal, and the record is largely undeveloped as to the basis for trial counsel's strategic decision.[4] We have held, with a regularity bordering on the metronomic, that, with few exceptions, claims of ineffective assistance of counsel, not seasonably raised in the trial court, are not ripe for review on direct appeal of a criminal conviction.[5] See United States v. Mala, 7 F.3d 1058, 1063

---

[3] Indeed, defense counsel arguably conceded that the prosecutor had acted in good faith by telling the district court that she (the prosecutor) was "doing the best she [could]" under the circumstances and later adding that the delayed disclosure was "not [the prosecutor's] fault."

[4] One thing is clear, though: trial counsel told the district court that his client (the appellant) "resisted any efforts to delay."

[5] The exceptions, which generally involve cases where the record is already fully developed in all material respects, see, e.g., United States v. Ortiz, 146 F.3d 25, 27 (1st Cir. 1998); United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991), are few and far between. The case at hand does not begin to meet those requirements.

(1st Cir. 1993) (collecting cases).  Rather, such claims must be brought in collateral post-conviction proceedings.  See United States v. Jones, 778 F.3d 375, 389 (1st Cir. 2015).  Accordingly, we dismiss this aspect of the appeal without prejudice.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, the appellant's conviction and sentence are affirmed.  The appeal is dismissed as to the claim of ineffective assistance of trial counsel; without prejudice, however, to the appellant's right, if he so chooses, to raise this claim by a petition for post-conviction relief pursuant to 28 U.S.C. § 2255.

**So Ordered.**